UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

CLEVELAND DIVISION

| | | |
|---|---|---|
| CITY OF LIVONIA RETIREE HEALTH AND DISABILITY BENEFITS PLAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | No. <br><br> CLASS ACTION |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| DIEBOLD NIXDORF, INCORPORATED, ANDREAS W. MATTES, CHRISTOPHER A. CHAPMAN and JUERGEN WUNRAM, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY
1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)

ROBBINS GELLER RUDMAN
 & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

Plaintiff City of Livonia Retiree Health and Disability Benefits Plan ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Diebold Nixdorf, Incorporated's ("Diebold" or the "Company") press releases and U.S. Securities and Exchange Commission ("SEC") filings, and analyst reports, media reports and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of Diebold common stock between February 14, 2017 to August 1, 2018, inclusive (the "Class Period"), against Diebold and certain of the Company's former executive officers seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

3.     Venue is proper in this District pursuant to §27 of the Exchange Act.  The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.  In addition, the Company maintains its corporate headquarters in this District.

4.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

**PARTIES**

5.      Plaintiff City of Livonia Retiree Health and Disability Benefits Plan purchased Diebold common stock during the Class Period, as described in the certification attached hereto and incorporated herein by reference, and suffered damages.

6.      Defendant Diebold is an international financial and retail technology company.  The Company is headquartered in North Canton, Ohio and its stock trades on New York Stock Exchange ("NYSE") under the ticker symbol DBD.

7.      Defendant Andreas W. Mattes ("Mattes") served as Diebold's President and Chief Executive Officer ("CEO") until he was asked to resign in December 2017.

8.      Defendant Christopher A. Chapman ("Chapman") served as Diebold's Chief Financial Officer ("CFO") throughout the Class Period.  He also served as interim Co-CEO between the tenures of defendant Mattes and Diebold's new CEO, Gerrard Schmid ("Schmid"), who was appointed in February 2018.  He abruptly left the Company shortly after the Class Period ended, in October 2018.

9.      Defendant Juergen Wunram ("Wunram") served as Diebold's Chief Operating Officer ("COO") for most of the Class Period.  Prior to February 2017, he served as Diebold's Chief Integration Officer.  He also served with defendant Chapman as interim Co-CEO between the tenures of defendant Mattes and Schmid.  Defendant Wunram left the Company during the Class Period, in May 2018.

10.      Defendants Mattes, Chapman, and Wunram are referred to herein as the "Individual Defendants."  During the Class Period, the Individual Defendants ran the Company as hands-on

- 2 -

managers, overseeing Diebold's operations and finances and made the materially false and misleading statements described herein.  The Individual Defendants had intimate knowledge about core aspects of Diebold's financial and business operations.  They were also intimately involved in deciding which disclosures would be made by Diebold.

**BACKGROUND**

11.    Defendant Diebold is an international financial and retail technology company that specializes in the sale, manufacture, installation, and service of self-service transaction systems (such as ATMs and currency processing systems), point-of-sale terminals, physical security products, and software and related services.

12.    In November 2015, Diebold entered into a merger agreement with one of its primary competitors, Germany's Wincor Nixdorf.  At the time, the acquisition was viewed as a means to stave off the threat posed by cashless transactions by creating the largest ATM manufacturer in the world with a dominant market share of over 30%.  As defendant Mattes, Diebold's CEO, described the deal, "by leveraging innovative solutions and talent from both organizations we will have the scale, strength and flexibility to help our customers through their own business transformation" and create a new global powerhouse "well positioned for growth in high-value services and software . . . across a broader customer base."  The companies had complementary geographic concentrations and the deal promised to provide access to a deep roster of customers across Eurasia and the Americas. The acquisition would also purportedly allow Diebold to grow its software and services offerings in order to retain its competitive edge, even as the world economy continued to shift to cashless transactions.

13.    Diebold conducted a public tender offer pursuant to which it acquired a majority of Wincor Nixdorf shares for €38.98 in cash plus 0.434 Diebold common shares for each Wincor Nixdorf share.  The consideration paid for Wincor Nixdorf was ultimately valued at $1.8 billion.

The Company took on more than $2 billion in debt to finance the acquisition, which closed in August 2016.

14.     Over the next several months, Diebold worked to integrate the two companies, with defendant Mattes claiming he had a 90% line-of-sight into merger benefits from ongoing implementation plans.

15.     In the months that followed, Diebold and its executives repeatedly claimed that integration efforts were exceeding expectations.  For example, defendant Mattes stated that he had "confidence" that Diebold "should be able to exceed [its] cost synergy targets for the year."  Diebold executives also repeatedly reaffirmed the Company's 2017 financial guidance.  As late as May 22, 2017, CEO Mattes stated that "everyone is singing off the same hymn sheet" in successfully executing sales targets as a combined business.  He represented that the Company was achieving "operational excellence," "financial excellence," and "sales excellence" and confirmed that the Company would "[a]bsolutely" experience "very, very strong earnings growth year-on-year as [Diebold] go[es] into 2018."

16.     These and similar statements were materially false and misleading when made.  In fact, Diebold was suffering from massive inefficiencies created by the acquisition, which had in fact materially *worsened* the Company's competitive position.  Executives were struggling with the complex task of combining two distinct organizational cultures and operational hierarchies and had failed to successfully integrate the two legacy sales forces and disparate IT and inventory systems.  As a result, Diebold had missed significant sales opportunities, was ceding market share to competitors, and was suffering from tens of millions of dollars in integration cost overruns.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

17.     The Class Period starts on February 14, 2017.  On that date, Diebold issued a press release providing investors with its fourth quarter and full year 2016 financial results, Diebold's first

full quarter as a combined business.  The release stated that quarterly revenue on a Generally Accepted Accounting Principles ("GAAP") basis had increased 103.7% to $1.2 billion and that GAAP earnings per share ("EPS") were a loss of $1.04, or earnings of $0.32 on a non-GAAP basis. The release also stated that "Diebold Nixdorf expects full-year 2017 revenue to be in the range of $5.0 billion to $5.1 billion, net loss in the range of $55 million to $30 million, and adjusted EBITDA in the range of $440 million to $470 million," with EPS of "approximately $(0.70) to $(0.40), or $1.40 to $1.70 on a non-GAAP basis."  Defendant Mattes was quoted in the release highlighting the Company's strategic acquisition of Wincor Nixdorf.  He stated the following in pertinent part:

> "Reflecting on 2016, it was a year of tremendous strategic achievements, in which we took major steps to accelerate our transformation and reshape our business portfolio while increasing our scale, power to innovate, geographic footprint and customer reach.
>
> "For 2017, we are focused on realizing our potential and delivering on our synergy goals . . . . *We enter the year leveraging a stronger, fully aligned global sales force, and a solid solutions portfolio with ample opportunity to succeed in the dynamic financial and retail markets*."

18.     That same day, Diebold hosted an earnings call to discuss the results, which was led by defendants Mattes and Chapman.  On the call, these defendants repeated the financial results and outlook provided in Diebold's fourth quarter 2016 release.  They also discussed the Wincor Nixdorf acquisition, claiming that it strategically positioned the Company to excel going forward.  For example, defendant Mattes stated in his prepared remarks that "[t]hese strategic achievements have had a profound impact on the Company."  He described the purported growth opportunities and resiliency created by the merger in pertinent part as follows:

> Looking at slide 4, you can see that we have doubled the size of our Company and have significantly enhanced our mix of revenue.  First, services represent a $2.5 billion business for us, up from about $1.3 billion.  Basically, our services business now is larger than either legacy company on a standalone basis.  And we have the largest organization focused exclusively on the banking and retail industries, with over 14,000 service professionals.

- 5 -

Next, our software revenue increased more than 3-fold, from about $110 million to $450 million.  Taken on its own, this would place our software business well within the top 100 software companies globally.

Looking at the ATM software market, according to RBR, Diebold Nixdorf is the leader, with nearly 30% share higher revenue.  This provides us with access to higher value and stickier revenue streams, as customers benefit from our stronger competitive position in software.  Together, software and services is approximately a $3 billion business.

The remaining $2 billion comes from our systems line of businesses, ATMs, point of sale, and other self-service terminals.  About one-third of all ATMs in service globally are Diebold Nixdorf.

With respect to retail POS, we are number one in Europe and among the top five globally.  In total, retail makes up 20% of our revenue, and we are excited to now have access to this very attractive market.  Retailers are responding to quickly changing consumer behaviors, with innovations in omni channel, payment and loyalty programs, and are less burdened by government regulations and compliance activities.

Over time, these innovations will influence how financial institutions serve customers.  We believe retail represents a significant growth opportunity for our Company.

In addition, we have expanded our revenue mix from digital, cardless, and mobile transactions, from approximately 20%, to about 40%.  ***So while cash use continues to grow globally and remains a very important enabler of our business, the continued growth of noncash transactions provides the Company with another avenue for growth***.

From a geographic standpoint, Diebold Nixdorf has a stronger orientation to develop markets where branch and store transformation and automation is underway, and the opportunity for value-added services is high.  Conversely, we have also lowered our exposure to the more volatile emerging market.

19.  Defendant Mattes also claimed that Diebold "continue[d] to make progress" on integration.  He claimed that the legacy sales forces had received extensive integration training and were now "fully aligned around our goals, quotas, and account plans."  Defendant Mattes also represented that Diebold had laid "the foundation of [its] new sales excellence programs" through training, strategic realignments, and other actions.  In response to an analyst question, defendant Mattes reiterated that initial sales integration issues were "***all . . . in the rear-view mirror. Everybody is aligned***."  Later, he again stated: "[W]e've got everybody on the same goal sheet.  We

- 6 -

now have the full domination agreement between the two Companies, and all the quotas are aligned."  On the call, defendant Chapman stated that Diebold was on track to realize "at least $40 million of our cost synergies" from the merger in 2017 alone.

20.     On February 24, 2017, Diebold filed its annual report on Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K"), which was signed by defendants Mattes, Chapman, and Wunram.  The 2016 Form 10-K repeated the Company's financial results provided in the February 14, 2017 press release.  It also highlighted the purported benefits from the merger with Wincor Nixdorf, stating in pertinent part:

> **The Company is executing a multi-year integration program designed to optimize the assets, business processes, and IT systems of Diebold Nixdorf.  This program, in aggregate, has identified an opportunity to realize approximately $160 [million] of cost synergies over three years**.  These cost synergies include:
>
> • Realizing volume discounts on direct materials
>
> • Harmonizing the solutions set
>
> • Increasing utilization rates of the service technicians
>
> • Rationalizing facilities in the regions
>
> • Streamlining corporate and general and administrative functions
>
> • Harmonizing back office solutions.
>
> The Company has and will continue to invest significant dollars to restructure the workforce, optimize legacy systems, streamline legal entities and consolidate real estate holdings.  **By executing these integration activities, the Company expects to deliver greater innovation for customers, career enrichment opportunities for employees, and enhanced value for shareholders**.

21.     On February 28, 2017, Diebold hosted an investor day during which defendants Mattes, Chapman, and Wunram highlighted the benefits that the Company was purportedly already experiencing from its acquisition of Wincor Nixdorf.  These defendants stated that Diebold now expected $200 million in net savings from the deal, with presentation materials describing the transition as a "**smooth integration of legacy organizations**."  Defendant Mattes represented that

Diebold was integrating so as to make "sure that we drive operational excellence."  Similarly, defendant Wunram gave an update as to where the Company was at "now with the integration," claiming that the Company was in the midst of being able to "really accelerate and implement the things that we before could mainly plan."  He continued by stating that customers "like the strength of Diebold in services and they like the strength of legacy Nixdorf in products, and they put their bets, so to say, on that, as Diebold Nixdorf combine these strengths together."  Investors were also told that the merger would result in $5.5 billion in revenue, 9% non-GAAP operating profits, and $3.50 in non-GAAP EPS by 2020, each of which represented substantial and sustained growth from current levels.

22.     On March 1, 2017, defendant Mattes presented to investors and analysts at the Morgan Stanley Technology, Media & Telecom Conference.  He once again stated that the Company was successfully implementing its integration strategies, claiming that Diebold was achieving "financial excellence," "operational excellence," and "sales excellence" and was on track to meet its integration targets, stating in pertinent part:

> One of the, I guess, challenges when you combine two companies is to make sure that you got everybody sitting up with (inaudible) sheet, you can set all-encompassing agenda [sic] for the organization.  So we put together very holistic program that addresses six areas and it starts with driving the strategy what we call collaborative innovation and connected commerce and that's all about moving away from an omni-channel environment to a connected commerce environment where banks and retailers are looking for the score of one or the bank of one and the question where do we take our Company in an industry that's changing very rapidly over the course of next 10 years, 15 years.  The second thing of course is around financial excellence, making sure that both companies perform.  We are deep self-help story and less of key items.
>
> ***Third element is integration, making sure that the synergies that we're going after will be unearthed and we will get to those soon enough to fasten up.  So it is around what is on operational excellence and we've got culture and talent.  We've got sales excellence, that's the whole envelope.  And if you put it in perspective the numbers, we are roughly a $5 billion company right now.  We're roughly on a pro forma basis on about a 5% op margins and we said we're going to be a $5.5 billion company in 2020 with an op margin north of 9%.  And we're taking the Company from an EPS of roundabout $1.60 to $1.10 to – at a 30%***

- 8 -

*through tax rate to an EPS number of roughly $3.50 at the end of the transformation program*.

23.     On May 4, 2017, Diebold issued a press release providing investors with its first quarter 2017 financial results.  The release stated that Diebold had achieved quarterly GAAP revenue of $1.1 billion and a GAAP EPS loss of $0.78, or earnings of $0.08 on a non-GAAP basis. It also lowered the Company's full-year 2017 outlook to $5 billion in revenue and net losses of between $75 million and $50 million, while reaffirming the year's adjusted EBITDA at between $440 million and $470 million.  Defendant Mattes was quoted in the release highlighting the closing of the Wincor Nixdorf acquisition and the Company's purportedly solid integration efforts and growth trajectory.  He stated the following in pertinent part:

> "*The transition to Diebold Nixdorf is complete;* now, we truly begin our long-term transformation with the DN2020 program we launched during the quarter . . . .  From a market perspective, I'm especially encouraged by the solid sequential growth in systems orders and backlog we generated during the period. This is a good indication that *our sales engine is gearing up after the breaking-in period of our new company in the second half of last year*."

> . . . "*In addition, the large, multi-year contract renewals we recently announced with our two largest outsourcing customers are a testament to our strong competitive position and a confirmation of our services-led, software-enabled strategy*.  They also point to the importance our customers place on effectively managing the enduring nature of cash usage, which is a key value we bring to the market."

24.     That same day, Diebold hosted an earnings call to discuss the results, which was led by defendants Mattes and Chapman.  On the call, these defendants repeated the financial results and outlook provided in Diebold's first quarter 2017 release.  They also discussed the Wincor Nixdorf acquisition, claiming that the Company was exceeding integration expectations.  For example, in his prepared remarks, defendant Mattes stated: "I'm pleased to report that we're off to a good start. . . . I'm encouraged by the early progress and our ability to coordinate numerous intersecting activities. This gives us confidence that we should be able to exceed our cost synergy targets for the year."  He

also stated that "[o]ur continued focus on cost reductions allows us to maintain our profitability and free cash flow targets."

25.     Also on May 4, 2017, Diebold filed its quarterly report on Form 10-Q for the quarter ended March 31, 2017, which was signed by defendants Mattes and Chapman.  The quarterly report repeated the Company's financial results provided in the May 4, 2017 press release.  It also highlighted purported benefits from the merger with Wincor Nixdorf, stating in pertinent part:

> The acquired Diebold Nixdorf AG goodwill is primarily the result of anticipated synergies achieved through increased scale, a streamlined portfolio of products and solutions, higher utilization of the service organization, workforce rationalization in overlapping regions and shared back office resources.   The Company also expects, after completion of the business combination and related integration, to generate strong free cash flow, which would be used to make investments in innovative software and solutions and reduce debt.

26.     On May 22, 2017, defendant Mattes presented to investors and analysts at the JPMorgan Tech, Media and Telecom Conference.  Defendant Mattes claimed once again that the Company had overcome integration-related issues, stating that everybody was "singing off the same hymn sheet."  He continued in pertinent part:

> And if you take a look at our order numbers, Q1, we're up nearly 30% in orders versus Q4.  *So you can clearly see that we've turned that page and we closed that chapter and we're back in the race*.
>
> *             *             *
>
> [The DN2020 transformation program is] the big program that has all the levers that we will pull in order to transform our company.  *So it's got strategy.  It's got operational excellence on the – it's got financial excellence.  Of course, it has the integration, the synergies.  It has sales excellence.  And it does have the cultural element that you need to do when you combine an American company with a German company.  By doing all of that, we put the customer in the center of it because, first, it needs to create customer value.  And then second, it will create shareholder value*.
>
> *             *             *
>
> Well, what we've basically done is through the acquisition and the integration, we've extended the walk space and we're going to run faster than we would have ever been able to do ourselves.

- 10 -

*　　　*　　　*

*But again, if you go back, it really gives you a good reason why this deal was the right thing for us to do because it's a lot easier to do that when you've got twice the volume versus if you have half the volume.*

27.　　In addition, defendant Mattes claimed that Diebold was tracking ahead of its integration targets, stating in pertinent part:

> We said the synergies are going to flow through roughly 20% in '17, 50% in '18 and 80% in '19 and the rest, of course, then in 2020 because, I mean, synergies repeat themselves. The cost to generate those synergies are a little bit more front-end loaded, which you would want us to. And you see that in our cash demands that we have for this year and early part of next year. *And on the ramp curve, I'm actually very encouraged of where we stand. We track all of these synergies. We have a wave tool in which every one of the ideas that we go after is being tracked, from origination to becoming tangible until it shows up on our bottom line. And as we said in our analyst call, we think that we will have pressure to increase the synergy realization numbers upwards in this calendar year, so very good efforts on the work of the teams.*

28.　　The statements referenced in ¶¶17-27 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants:

(a)　　that Diebold was suffering from tens of millions of dollars in operational inefficiencies and cost overruns as a result of the Wincor Nixdorf merger, which more than offset any purported merger "synergies";

(b)　　that Diebold had encountered extreme difficulties integrating the two legacy sales forces, IT systems, and inventory management systems and had run into other operational difficulties;

(c)　　that Diebold was missing out on sales opportunities and losing market share to competitors in both Europe and North America as a result of the integration problems;

(d)　　that Diebold had overvalued assets acquired in the Wincor Nixdorf merger by at least $100 million;

- 11 -

(e)      that Diebold was tracking nearly $400 million below 2017 revenue targets and was on track to suffer more than $100 million in losses for the year beyond what had been presented to investors;

(f)      that Diebold required hundreds of millions of dollars in additional capital to fully integrate Wincor Nixdorf; and

(g)      that, as a result of (a)-(f) above, Diebold's business and operations had been materially impaired as a result of the merger, the Company was suffering from accelerating losses, and defendants' financial projections lacked a reasonable basis.

29.      In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), required the 2016 Form 10-K to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose the full extent of the Company's integration problems was a violation of Item 303 because they were known trends and uncertainties that were likely to, and did, have a material unfavorable impact on the Company's revenues and income from continuing operations.

30.      On July 5, 2017, the Company issued a press release lowering its financial outlook for 2017.  The Company stated that it now expected 2017 revenue of only between $4.7 billion and $4.8 billion and earnings per share on a GAAP basis in the range of $(1.65) to $(1.45), or $0.95 to $1.15 on a non-GAAP basis.  In a later conference call, defendant Chapman stated that Diebold had "underestimated the amount of distractions tied to the integration, the amount of change that we introduced into the organization and also the size of the hole that we dug ourselves as we exited '16 and came into '17."

31.      On the unexpected guidance cut, which came only a few weeks after defendants had claimed that integration efforts were proceeding smoothly, the price of Diebold stock fell 23% to

- 12 -

$21.60 by market close on July 5, 2017, on abnormally high volume of over 10 million shares traded.

32.    However, because investors did not know the full truth about the Company's integration problems, the price of Diebold stock remained artificially inflated.  Instead, defendants continued to mislead investors about the true state of Diebold's business.  For example, at the same time that Diebold lowered its 2017 guidance it actually *raised* purported merger synergies by $40 million to $240 million.

33.    On July 19, 2017, Diebold issued a press release providing investors with its second quarter 2017 financial results.  The release stated that Diebold had achieved quarterly GAAP revenue of $1.1 billion and a GAAP EPS loss of $0.41, or earnings of $0.08 on a non-GAAP basis.  It also reaffirmed the Company's revised 2017 outlook of $4.7 to $4.8 billion in revenue and stated that Diebold was on track to post net losses of between $125 million and $110 million and adjusted EBITDA of $360 million to $380 million.  Defendant Mattes claimed in the press release that the "'sales trend has been improving.'"  He also stated that, "'[a]s we near the first anniversary of the combination of our two companies, I am more confident than ever that we are uniquely positioned to deliver innovative solutions to our customers and long-term value to our stakeholders.'"

34.    That same day, Diebold hosted an earnings call to discuss the results, which was led by defendants Mattes and Chapman.  On the call, these defendants repeated the financial results and outlook provided in Diebold's second quarter 2017 release.  On the call, these defendants claimed that the Company had put in place remedial measures to turn around adverse trends and realize even more purported benefits from the merger.  For example, defendant Mattes stated: "Our DN2020 initiatives continue to point to significant scale benefits for the new company.  As a result of the increased visibility on our cost structure, *we now expect net savings of $240 million by the end of 2020*."  Defendant Chapman extrapolated on these purported improvements, stating in pertinent part:

Yes, let me first go through the overall change in the DN2020 cost targets. So we had outlined approximately $200 million at that time, and we've increased it to $240 million. You can hear from the expectations in '17, we're looking to run at about an additional $10 million through. And if you think about it from a sequential standpoint, we're looking at pulling some things in from the 2020 standpoint into '19 and accelerating some of the activities where we've seen very good progress. If you break it down by the major categories that we highlighted previously, I'll just take you through the 3 main buckets here. We'd indicated service cost of sales benefits were roughly $50 million. We're increasing that to $65 million. On the system side, we previously had approximately $60 million, and we're increasing that to $70 million. And then on the overall op expense side, we were at $90 million, and we're increasing that to around $105 million. So that's the rough breakdown of what we see. With regards to the $3.50, that remains our outlook for the long term, and we are looking at pursuing all appropriate pathways to achieve that over the next several years.

35.     On July 26, 2017, Diebold filed its quarterly report on Form 10-Q for the quarter ended June 30, 2017, which was signed by defendants Mattes and Chapman. The quarterly report repeated the Company's financial results provided in the July 19, 2017 press release. It also highlighted the purported benefits from the merger with Wincor Nixdorf, stating in pertinent part:

The acquired Diebold Nixdorf AG goodwill is primarily the result of anticipated synergies achieved through increased scale, a streamlined portfolio of products and solutions, higher utilization of the service organization, workforce rationalization in overlapping regions and shared back office resources. The Company also expects, after completion of the business combination and related integration, to generate strong free cash flow, which would be used to make investments in innovative software and solutions and reduce debt.

36.     On October 31, 2017, Diebold issued a press release providing investors with its third quarter 2017 financial results. The release stated that Diebold had achieved quarterly GAAP revenue of $1.1 billion and a GAAP EPS loss of $0.47, or earnings of $0.58 on a non-GAAP basis. It also lowered the Company's 2017 revenue outlook to $4.6 billion and net losses to $140 million to $130 million, but raised adjusted EBITDA to $370 million to $380 million. The release quoted defendant Mattes, who claimed that Diebold had made great strides in its integration efforts and implementing the Company's growth strategies. He stated in pertinent part:

"*We are encouraged to see our integration and transformation achievements begin to translate into meaningful cost synergies, as improved*

- 14 -

*earnings during the quarter were driven by a combination of cost actions as well as a lower tax rate* . . . ."

"We continue to make tangible progress in transforming to a services-led, software-enabled company.  During the quarter, we signed services contracts valued at more than $300 million, and on a year-to-date basis our renewal rate is close to 100 percent. In software, we delivered our strongest quarter since completing the acquisition of Wincor Nixdorf.  Also, we continue to build momentum in delivering new innovation for customers, recently launching new offerings in 'managed mobility', ATM as a service and the new Vynamic software suite – the first platform to power connected commerce across the financial services and retail industries. While significant work remains, *we see terrific opportunities to leverage our scale and advance our industry leadership, enabling the company to create greater value moving forward*."

37.     That same day, Diebold hosted an earnings call to discuss the results, which was led by defendants Mattes, Chapman, and Wunram.  On the call, these defendants repeated the financial results and outlook provided in Diebold's third quarter 2017 release.  In addition, defendant Mattes stated that "integration and transformation achievements" had "translate[d] into meaningful cost synergies during the third quarter" and that the Company was "achieving the integration milestone, which we established."  Defendant Wunram followed these comments in his prepared remarks, stating in pertinent part:

*Our integration accomplishments are clear*.  We can see the projects being executed and can see the results in our operating profit.  While there is still work ahead of us, the company has already made many of the difficult and complex changes to adjust the cost baseline, which is necessary in an integration of our size.

*As previously committed, our DN2020 program will expect to deliver $240 million operating profit impact through 2020*.  We expect the cost savings to be delivered as follows: $105 million in OpEx through corporate and regional functional management integration, back-office and shared service integration, as well as R&D synergies and scale.  On the cost of sales side, we are targeting $135 million in operating profit impact, of which $70 million will come from systems and $65 million from services.

*Our achievements and outlook on the integration of DN2020 cost savings remain positive.  Our systematic approach, comprehensive implementation framework and controlling methodology has helped to align the company with this crucial program.  The organization is committed to deliver on our DN2020 initiatives to achieve our cost reduction target, as well as the broader transformational objectives within the DN2020 framework. Getting our cost basis*

- 15 -

*right provides us with the capacity to make strategic investments and focus on growth*.

38.     Also on October 31, 2017, Diebold filed its quarterly report on Form 10-Q for the quarter ended September 30, 2017, which was signed by defendants Mattes and Chapman.  The quarterly report repeated the Company's financial results provided in the October 31, 2017 press release.  It also highlighted the purported benefits from the merger with Wincor Nixdorf, stating in pertinent part:

> The acquired Diebold Nixdorf AG goodwill is primarily the result of anticipated synergies achieved through increased scale, a streamlined portfolio of products and solutions, higher utilization of the service organization, workforce rationalization in overlapping regions and shared back office resources.  The Company also expects, after completion of the business combination and related integration, to generate strong free cash flow, which would be used to make investments in innovative software and solutions and reduce debt.

39.     On December 13, 2017, Diebold issued a press release announcing that defendant Mattes was stepping down effective immediately, with defendants Chapman and Wunram taking over as interim Co-CEOs.  Media reports confirmed that defendant Mattes had been asked to leave due to Diebold's poor financial performance following the merger with Wincor Nixdorf.

40.     On February 13, 2018, Diebold issued a press release providing investors with its fourth quarter and full year 2017 financial results.  The release stated that Diebold had achieved quarterly GAAP revenue of $1.2 billion and a GAAP EPS loss of $1.43, or earnings of $0.40 on a non-GAAP basis.  For the full year, Diebold generated only $4.6 billion in revenue, nearly $400 million below prior estimates.  It also suffered a loss of over $205 million for the year.  In addition, the release provided the Company's 2018 outlook, projecting revenues of between $4.5 billion and $4.7 billion, net losses of between $65 million and $40 million, and adjusted EBITDA of between $380 million and $410 million.  The release also projected 2018 GAAP EPS of between ($0.80) to $(0.50) and an adjusted EPS of between $1.00 and $1.30.  Defendant Wunram was quoted in the release as stating: "'*[W]e are pleased with the pace of our integration efforts*, which are [sic]

- 16 -

enabling the company to streamline costs, increase productivity and strengthen our competitiveness.'"

41.    That same day, Diebold hosted an earnings call to discuss the results, which was led by defendants Wunram and Chapman.  On the call, these defendants repeated the financial results and outlook provided in Diebold's fourth quarter 2017 release.  On the call, defendant Chapman stated: "Looking to 2018, we are encouraged by the stability and improvements we've seen in the services and software businesses over the past two quarters."  He continued: "We've delivered double-digit growth in software order entry and have a solid service contract base entering the year." Similarly, defendant Wunram stated that Diebold had made considerable progress on its integration initiatives, stating in pertinent part:

> We made significant progress in 2017.  We have reduced headcount by 1,300 full-time positions, with a net impact closer to 1,000 employees.  While this activity occurred throughout the organization, a larger proportion came from G&A functions, such as finance, IT and support roles.
>
> In addition, we are streamlining G&A spend through process improvements, greater use of shared services and implementation of best practices.  Next, as of today, we have consolidated more than three quarters of our redundant country legal entities.  This project simplifies business processes at the country level, and boosts productivity by unifying our core IT systems. ***These activities are resulting in incremental G&A synergies from management integration, back-office consolidation and operational excellence***.
>
> In the area of Research and Development, we eliminated redundant projects, streamlined the portfolio and refocused our efforts on innovation for customers.  We have reallocated resources to invest more heavily in our Connected Commerce strategy, including our Vynamic software platform.
>
> We have reduced our global manufacturing capacity from 180,000 ATMs per year to around 100,000.  We also streamlined the number of ATM models by more than 50%, and renegotiated more than 90% of our direct material spend.  These activities have taken on greater importance to maintain our gross margin in the systems line of business, while we have experienced lower demand for banking hardware.  Within the Services line of business, we have consolidated and standardized service delivery for approximately 90% of countries.  To enhance our operating efficiency, we have also eliminated approximately 1/4 of our service parts depots around the globe.

- 17 -

*Through our execution of the DN2020 program, the company realized over $100 million of savings as the result of our integration and operational excellence programs during 2017 and we expect to realize at least another $50 million of savings in 2018*.

42.     On February 21, 2018, Diebold issued a press release announcing the appointment of Schmid as its new President and CEO.

43.     On February 28, 2018, Diebold filed its annual report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K"), which was signed by defendants Chapman and Wunram.  The 2017 Form 10-K repeated the Company's financial results provided in the February 13, 2018 press release.  It also highlighted the purported benefits from the merger with Wincor Nixdorf, stating in pertinent part:

Commensurate with its strategy, ***the Company is executing a multi-year integration and transformation program, called DN2020, which aligns employee activities with the Company's goal of realizing $240 [million] of operating profit savings by the year 2020***.  Additional objectives of the program are to deliver greater innovation for customers, career enrichment opportunities for employees, and enhanced value for shareholders. DN2020 consists of six inter-related elements:

*Advancing the Company's Connected Commerce Strategy* – the Company will continue to develop innovative technology and partner with external companies to deliver highly secure customer-centric solutions.  This includes the application of cloud computing technology, mobile technology, sensors and the Internet of Things, as well as open and agile software delivered "as-a-service."

*Pursuing Finance Excellence* – the Company will continuously improve its financial reporting, analysis and controls by emulating best practices from similar business entities.  The Company's initiatives are designed to improve forecasting accuracy, optimize working capital management and pursue prudent capital allocation strategies which enhance shareholder value.  At present, the Company's capital allocation priorities are to reduce its leverage and accelerate the realization of its cost reductions and synergies.

*Executing the Company's Integration Plan* – the Company's detailed integration plan is designed to harmonize legacy business practices and build upon the best practices from each legacy company.  The integration plan will leverage the Company's global scale, reduce overlap and improve the profitability of the Company.

*Pursuing Operational Excellence* – to strengthen its market leading position, the Company will implement best practices to improve operational efficiency and

- 18 -

increase customer satisfaction.  Robust reporting and tracking tools will be used to achieve best-in-class service and manufacturing levels.

*Establish an Innovative Culture, which Attracts Industry-Leading Talent* – the Company aims to become an employer of choice in the Connected Commerce space. We are building a culture characterized by innovation, customer collaboration, accountability and strong ethical behavior.  The Company encourages experiential learning and will invest in training resources for the purposes of developing a vibrant workforce and expanding its leadership in Connected Commerce.  Performance-based rewards and recognition policies are aligned with Company objectives and market opportunities.

*Pursuing Sales Excellence* – a capable and progressive sales organization is vital to the future growth of the Company.  The Company will invest in the sales organization to ensure it has the skills, resources, and processes needed to support customers in their digital transformation journey.  At the country level, we will optimize sales staffing and invest in partner programs commensurate with overall market demand.  As a result of these investments, the Company expects to increase its pipeline of opportunities and increase its win rate over time.

44.     The 2017 Form 10-K also highlighted purported cost savings that would be achieved as a result of the Wincor Nixdorf merger, stating in pertinent part:

The financial objective of DN2020 is to realize approximately $240 [million] of cost savings through 2020, including improvements realized through the Acquisition.  Cost savings include:

- Realizing volume discounts on direct materials

- Harmonizing the solutions set of platforms and components

- Increasing utilization rates of the service technicians

- Rationalizing facilities in the regions

- Streamlining corporate and general and administrative functions

- Harmonizing back office solutions.

*In order to achieve these savings, the Company has and will continue to invest significant dollars to restructure the workforce, integrate and optimize systems, streamline legal entities and consolidate real estate holdings.  By executing these activities, the Company expects to deliver greater innovation for customers, career enrichment opportunities for employees, and enhanced value for shareholders*.

45.     The statements referenced in ¶¶30, 32-38, 40-41 and 43-44 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants:

(a)     that Diebold had not successfully remediated problems stemming from the Wincor Nixdorf acquisition, and such problems were in fact worsening;

(b)     that Diebold continued to suffer from tens of millions of dollars in operational inefficiencies and cost overruns as a result of the Wincor Nixdorf merger, which more than offset any purported merger "synergies";

(c)     that Diebold continued to experience extreme difficulties integrating the two legacy sales forces, IT systems, and inventory management systems, as well as other operational difficulties;

(d)     that Diebold was still missing out on sales opportunities and losing market share to competitors in both Europe and North America as a result of the integration problems;

(e)     that Diebold had overvalued assets acquired in the Wincor Nixdorf merger by more than $100 million;

(f)     that Diebold was on track to suffer hundreds of millions of dollars in additional losses in 2018 beyond what had been previously presented to investors;

(g)     that Diebold required hundreds of millions of dollars in additional capital to fully integrate Wincor Nixdorf; and

(h)     that, as a result of (a)-(g) above, Diebold's business and operations had been materially impaired as a result of the merger, the Company was suffering from accelerating losses, and defendants' financial projections lacked a reasonable basis.

46.     In addition, Item 303 required the 2017 Form 10-K to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose the extent of the Company's integration problems was a violation of Item 303 because they were known trends and uncertainties that were likely to, and did, have a material unfavorable impact on the Company's revenues and income from continuing operations.

47.     On March 22, 2018, Diebold announced that defendant Wunram would be exiting the Company on May 31, 2018.

48.     On May 2, 2018, Diebold issued a press release announcing disappointing first quarter 2018 financial results.  The release stated that the Company had achieved revenue of $1.1 billion for the quarter and a $21 million operating loss.  The release also revised upward the projected net loss for the year by about $30 million, to a range of between $95 million and $75 million.  In addition, the Company announced it was suspending its shareholder dividend to improve its cash position and debt position.  On a conference call to discuss the results, the new CEO, Schmid, revealed that Diebold had been rendered too "complex" by the integration of Wincor Nixdorf, resulting in unnecessary redundancies, increased costs, and operating inefficiencies.  Later on the call, Schmid blame much of the Company's problems on previously undisclosed issues created by the acquisition, stating in pertinent part:

> I think at the – from my vantage point, the combination of the two organizations in late 2016 was probably one of the core drivers for the additional complexity in our IT environment.  I do think it's important that as part of my strategic agenda, I look to explore ways to further standardize and harmonize that platform.  These are obviously not straightforward easy initiatives, as I'm sure you can well appreciate, especially when one's touching supply chain in the European environment.  I do think that I made earlier on reference to the cultural differences between the two prior organizations.  I think that was a determinant in not necessarily getting ahead of this question, ahead of time.  But I would just simply say, it needs to be an important part of my agenda.

49.     On the call, analysts expressed surprise that the Company was still dealing with unnecessary complexities and costs, as they understood from prior management's comments that the issues had been largely remediated.  On this news, the price of Diebold stock fell 16% to $12.90 per share by market close on May 2, 2018, on abnormally high volume of over 6 million shares traded.

50.     However, because investors did not know the full truth about the Company's integration problems, the price of Diebold stock remained artificially inflated.  Instead, defendants continued to mislead investors about the true state of Diebold's business.  For example, at the same time that Diebold issued disappointing first quarter 2018 financial results, it largely reaffirmed the Company's unachievable 2018 financial guidance, which lacked a reasonable basis.

51.     Then on August 1, 2018, in connection with the Company's release of its second quarter 2018 financial results, Diebold shocked the market by disclosing that its business condition was far worse than previously disclosed.  Diebold revealed that it had suffered an operating loss of over $131 million during the quarter, which included a $90 million impairment of assets primarily related to the Wincor Nixdorf acquisition.  The Company revised its annual revenue guidance downward to $4.5 billion, the bottom of its prior range.  Even more concerning, it revealed that the Company was tracking $100 million below prior adjusted EBITDA estimates, at a range of only $280 million to $320 million, while net losses for the year were expected to reach a staggering ***$365 million to $325 million***.  As a result, Diebold stated that it needed to engage its lenders to review its credit agreements, an indication that the Company was running into significant liquidity concerns.

52.     In the earnings release and on the conference call to discuss the results, Diebold's management once again blamed previously undisclosed complexities created by the Wincor Nixdorf acquisition, despite the fact that the merger had closed nearly ***two years earlier***.  As Schmid explained:

These disappointing operational matters and higher costs, some of which are temporary, while others will take longer to work through, impacted our quarterly profits and are the main reasons why we are revising our outlook for 2018. . . .

It has become quite clear to me that complexity is driving higher costs in the business.  As I mentioned on the prior call, our cost structure is inefficient because it continues to reflect attributes of the two legacy companies as well as the complexity inherent in the breadth of our product lines.

*          *          *

At the end of the day, the complexity of our operating model effectively has services actions distributed globally across multiple operating units, which, quite frankly, I think, is the fundamental reason for – the reason why we are – where we are today.

*          *          *

The supply chain issues are only being driven by two factors.  The one factor is, obviously, the excessive complexity on our own product portfolio, which adds some vulnerability to our supply chain . . . .

53.     An analyst on the call characterized as "disturbing" the belated admission that Diebold was still "riddled with inefficienc[ies]."  He asked, apparently in exasperation, "Where is the accountability there for the 600-or-so basis points of margin compression you've seen since the merger"?  In response to another analyst question, Schmid stated that Wincor Nixdorf was still not fully integrated, despite defendants' prior false and misleading statements to the contrary, but rather characterized the Company as in the midst of a "journey to integrate."

54.     On this news, the price of Diebold stock fell 38% to $7.05 per share by market close on August 1, 2018, on abnormally high volume of over 11 million shares traded.

55.     In the months that followed, the price of Diebold stock continued its downward spiral as the Company's problems continued to spill out into the open.  Diebold took additional impairments related to the Wincor Nixdorf acquisition in the third quarter and a related upward adjustment in the fourth quarter of 2018, leading to total goodwill impairment for the year of over $217 million.  Defendant Chapman left the Company in October 2018, and Diebold would later admit that it did not maintain effective controls over its financial reporting during the Class Period.

By December 2018, the price of Diebold stock had fallen to less than $3 per share, more than *90%* below its Class Period high.

56.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class (defined below) purchased Diebold common stock at artificially inflated prices, suffered significant losses and were damaged thereby.

**NO SAFE HARBOR**

57.     Defendants' "Safe Harbor" warnings accompanying Diebold's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

58.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Diebold who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

**ADDITIONAL SCIENTER ALLEGATIONS**

59.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and actions intended to manipulate the market price

of Diebold common stock as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Diebold, their control over, and/or receipt or modification of Diebold's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Diebold, participated in the fraudulent scheme alleged herein.

60.     The adverse developments at issue also impacted the Company's most important revenue streams and derived from the Company's most important business relationships.  The Wincor Nixdorf acquisition was the most important acquisition in the Company's history and the Individual Defendants were personally involved in the integration efforts and in reporting the progress of those efforts to investors.  The Individual Defendants repeatedly held themselves out to investors as the employees most knowledgeable on these topics and stated that they had significant visibility into the Company's integration progress and timeline.  As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.  These defendants also had the motive and opportunity to commit the fraud.  For example, in conference calls with investors, they regularly highlighted bonus compensation tied to integration targets and the acceleration of integration goals as exceedingly strong motivating factors.  The exit of each of the Individual Defendants during or soon after the Class Period also supports a compelling inference of scienter.

## LOSS CAUSATION

61.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Diebold common stock and operated as a fraud or deceit on purchasers of Diebold common stock.  As detailed above, when the truth about Diebold's misconduct was revealed over time, the value of the Company's

stock declined precipitously as the prior artificial inflation no longer propped up the stock's price. The declines in the price of Diebold stock were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price declines negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of the Company's stock and the subsequent significant decline in the value of the Company's stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

62.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and the other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Diebold's business, operations, and financial condition, as alleged herein. Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Diebold common stock to be artificially inflated. Plaintiff and other Class members purchased Diebold stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

63.     At all relevant times, the market for Diebold common stock was an efficient market for the following reasons, among others:

(a)     Diebold stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

- 26 -

(b)     according to the Company's Form 10-K, filed on March 1, 2019, the Company had over 76 million shares of stock outstanding as of February 25, 2019, demonstrating a very active and broad market for Diebold common stock;

(c)     as a regulated issuer, Diebold filed periodic public reports with the SEC;

(d)     Diebold regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)     unexpected material news about Diebold was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

64.     As a result of the foregoing, the market for Diebold common stock promptly digested current information regarding Diebold from publicly available sources and reflected such information in Diebold's stock price.  Under these circumstances, all purchasers of Diebold common stock during the Class Period suffered similar injury through their purchases of Diebold common stock at artificially inflated prices, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

65.     This is a class action on behalf of all purchasers of Diebold common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

66.     Common questions of law and fact predominate and include: (a) whether defendants violated the Exchange Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether the

price of Diebold common stock was artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

67.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Diebold common shares were actively traded on the NYSE.  Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.

68.    Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

69.    Plaintiff incorporates ¶¶1-68 by reference.

70.    During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they, directly and indirectly, by use of the means and instrumentality of interstate commerce, including the mail or facility of a national securities exchange:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Diebold common stock during the Class Period.

72.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Diebold common stock.  Plaintiff and the Class would not have purchased Diebold common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

73.      By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.      As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Diebold common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

75.      Plaintiff incorporates ¶¶1-74 by reference.

76.      During the Class Period, the Individual Defendants acted as controlling persons of Diebold within the meaning of §20(a) of the Exchange Act.  By virtue of their executive and/or Board positions, stock ownership, and culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which plaintiff contends were false and misleading as detailed herein.

77.      The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to

- 29 -

be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

78. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

79. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 20, 2019    MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY

*s/ Joseph F. Murray*

JOSEPH F. MURRAY

1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com

ROBBINS GELLER RUDMAN
    & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

VANOVERBEKE, MICHAUD &
    TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF LIVONIA RETIREE HEALTH AND DISABILITY BENEFITS
PLAN ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at
the direction of plaintiff's counsel or in order to participate in this private action or
any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the
class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period
in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in
a class action that was filed under the federal securities laws within the three-year
period prior to the date of this Certification except as detailed below:

6.    Plaintiff will not accept any payment for serving as a representative
party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

DIEBOLD

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ⟨19⟩ day of August, 2019.

CITY OF LIVONIA RETIREE HEALTH
AND DISABILITY BENEFITS PLAN

By: _____

Its: _____

- 2 -

DIEBOLD

SCHEDULE A

SECURITIES TRANSACTIONS

Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/17/2017 | 1,768 | $29.25 |
| 04/03/2017 | 1,574 | $29.75 |
| 04/12/2017 | 747 | $28.72 |
| 04/27/2017 | 842 | $28.88 |
| 05/18/2017 | 768 | $26.25 |
| 07/05/2017 | 922 | $21.79 |
| 07/13/2017 | 84 | $21.20 |
| 07/19/2017 | 269 | $22.01 |
| 07/19/2017 | 312 | $21.96 |
| 07/20/2017 | 52 | $21.99 |
| 07/21/2017 | 654 | $21.96 |
| 09/14/2017 | 171 | $20.88 |
| 11/20/2017 | 1,062 | $19.01 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 06/29/2017 | 403 | $27.45 |
| 09/18/2017 | 222 | $21.23 |
| 10/06/2017 | 401 | $22.45 |
| 10/16/2017 | 184 | $22.58 |
| 11/28/2017 | 326 | $19.00 |
| 03/29/2018 | 196 | $15.43 |
| 04/25/2018 | 133 | $16.00 |
| 05/15/2018 | 170 | $12.80 |
| 06/13/2018 | 301 | $12.31 |
| 07/12/2018 | 106 | $12.90 |